**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ERIC GARCIA,**<br>**Plaintiff,** | § § § | |
| **v.** | § | **CIVIL ACTION NO. __________** |
| | § | |
| **SERGEANT NATHANIEL BROWN and CITY OF BAYTOWN, TEXAS,**<br>**Defendants.** | § § § § § § | **JURY DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Eric Garcia ("Mr. Garcia") files this Original Complaint against Defendants Sergeant Nathaniel Brown and the City of Baytown, Texas, and respectfully shows the Court as follows:

## I. INTRODUCTION

1. Shortly before 1:00 a.m. on October 12, 2025, Baytown Police Sergeant Nathaniel Brown drove into the parking lot of the Palms Motel on his own initiative—no one had called the police—and confronted Eric Garcia outside the motel room where Mr. Garcia was staying. Within minutes Brown had pinned Mr. Garcia against a parked SUV and handcuffed his hands behind his back. Brown then hoisted the handcuffed man away from the SUV and drove him face-first into the concrete walkway. For nearly a minute

afterward, Brown knelt on Mr. Garcia's back with his full body weight while a witness told him, over and over, that Mr. Garcia was disabled and had metal pins in his body. Mr. Garcia left the Baytown jail in an ambulance.

2. Brown had done this before, and the City of Baytown knew it. In June 2020, Brown was recorded forcing a bystander at a traffic stop to the ground and kneeing him in the face. The City's own Chief of Police concluded that Brown's conduct "did not align with the professional standards and values" of the Department and fired him, and a Harris County grand jury indicted him for assault. Brown was nonetheless returned to the force, and in June 2024 the City promoted him to sergeant—a position in which he supervises other officers. Sixteen months later, Sergeant Brown slammed Mr. Garcia into the concrete. Brown's own report of that use of force was still marked "NOT APPROVED" 51 days later.

## II. PARTIES

3. Plaintiff Eric Garcia is an adult who resides in Baytown, Harris County, Texas.

4. Defendant Nathaniel Brown, also known as Nathan Brown, is a sergeant and licensed peace officer employed by the Baytown Police Department, Badge No. S144. At all relevant times he acted under color of state law and in the course and scope of his employment with the City of

Baytown. He is sued in his individual capacity. He may be served at the Baytown Police Department, 3200 North Main Street, Baytown, Texas 77521, or wherever he may be found.

5. Defendant City of Baytown, Texas (the "City") is a home-rule municipality located principally in Harris County, Texas. The City operates the Baytown Police Department (the "Department") and employs its officers, including Brown. The City may be served through its mayor, Charles Johnson, or its city clerk, Angela Jackson, at Baytown City Hall, 2401 Market Street, Baytown, Texas 77520.

## III. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b)(1)–(2) because the City is located in this District and all of the events giving rise to these claims occurred in Baytown, Harris County, Texas. Harris County lies within the Houston Division. 28 U.S.C. § 124(b)(2).

## IV. FACTUAL ALLEGATIONS

### A. Brown starts an encounter that no one asked for.

8. At about 12:52 a.m. on October 12, 2025, Mr. Garcia was at the Palms Motel, 605 North Alexander Drive, Baytown, Texas 77520. He and Andrea Martinez were staying in Room 21, a ground-floor room that opens onto the motel's covered breezeway.

9. Brown was patrolling alone in a marked Baytown police vehicle. He turned into the motel parking lot on his own initiative. The Department's dispatch record shows that Brown opened the call himself by radio and that it was logged as "UNKNOWN PROBLEM." No one—not motel staff, not another guest, not a passerby—had called the police or complained about Mr. Garcia.

10. Mr. Garcia stepped out of Room 21 and stood on the breezeway just outside the open door of his room. He was on private motel premises. He was not in a street or roadway, was not driving or near a running vehicle, and was not bothering anyone.

11. Brown opened the conversation by asking Mr. Garcia—"jokingly," in Brown's own words—whether he was scared.

12. Brown later wrote that Mr. Garcia had a beer in his hand, smelled of alcohol, had red eyes and slowed speech, and had walked along the breezeway after seeing Brown's patrol car. Brown also wrote that Mr. Garcia

was "speaking calm[l]y." (Brown's report is typed in capital letters; quotations from it in this Complaint are reproduced in ordinary case.)

13. Brown did not see Mr. Garcia stumble, fall, wander toward traffic, threaten anyone, or do anything that endangered himself or another person, and Brown's report records no such fact. Public intoxication is an offense in Texas only when a person appears in a public place "while intoxicated to the degree that the person may endanger the person or another." Tex. Penal Code § 49.02(a). Nothing Brown recorded suggests that Mr. Garcia was a danger to himself or anyone else.

14. Brown repeatedly demanded Mr. Garcia's name. Mr. Garcia was not under arrest when Brown asked, and declining to identify oneself to an officer before a lawful arrest is not an offense in Texas. *See* Tex. Penal Code § 38.02(a).

15. Brown did not know who Mr. Garcia was. His report states that "at this point, I did not know who Eric was." The dispatch record shows that Mr. Garcia's name was not run through any records system until 12:59 a.m.—after Brown had already radioed that the scene was "secure." When Brown seized Mr. Garcia, he did not know of any warrant.

### B. Brown seizes Mr. Garcia and handcuffs him.

16. Brown grabbed Mr. Garcia by the arm and shirt, pulled him away from the doorway of his room, pushed him across the parking lot to a black

SUV, and pinned him against it. As he did so, Brown told Mr. Garcia that he was "outside drinking alcohol."

17. Mr. Garcia did not fight Brown. He raised his hands and placed them on the SUV. He did not strike at Brown, threaten him, or try to run. He was confused, and he repeatedly asked Brown what he had done wrong. He told Brown that he could not bend the way Brown was forcing him because he is disabled. Mr. Garcia has surgical hardware—metal pins—in his body.

18. Ms. Martinez came out of the room. Brown pushed her away. She was unarmed, never struck Brown, and stood back on the breezeway, several feet away, recording on her phone.

19. Brown pulled Mr. Garcia's arms behind his back and handcuffed his wrists together behind him.

### C. Brown slams the handcuffed Mr. Garcia face-first into the concrete.

20. After Mr. Garcia was handcuffed, Brown wrapped both arms around him from behind, hoisted him away from the SUV, and drove him face-first onto the concrete walkway of the breezeway. With his hands cuffed behind his back, Mr. Garcia could not break his fall. His face struck the concrete.

21. Immediately before Brown took him down, Mr. Garcia was not pulling away, tensing his body, throwing his arms or body forward, trying to

flee, or moving toward Brown. He was handcuffed, unarmed, and compliant. Brown's own arrest record lists Mr. Garcia as "UNARMED."

22. Even on Brown's own account, Mr. Garcia was pressed stomach-first against the SUV with his hands being cuffed behind him, and Brown had him wrapped in what Brown calls a "bear hug," when Brown took him to the ground. A man held that way can neither strike an officer nor escape from one.

23. Once Mr. Garcia was face-down on the concrete, Brown dropped his knee into Mr. Garcia's back and bore down with his full body weight. Brown drove his forearm and elbow into Mr. Garcia's shoulder and the back of his head, pinning his face to the concrete. Brown's report admits that he used his forearm to "pin him to the ground."

24. Brown kept Mr. Garcia face-down, handcuffed, and under his weight for nearly a minute. Throughout, Ms. Martinez told Brown again and again that Mr. Garcia was disabled and that he had pins in his body. Mr. Garcia told Brown the same thing. Brown did not get off him. Brown's weight forced the metal hardware in Mr. Garcia's body against the concrete.

25. Brown then hauled Mr. Garcia to his feet, pushed him against a wall, lifted him off his feet, and carried him to the patrol car of Officer Ethan Maresh. Mr. Garcia cried out that he was paraplegic. Brown's report records that statement and dismisses it.

26. Only after Mr. Garcia was locked in the back seat of Officer Maresh's car—logged by dispatch at 1:01 a.m. as "one male in my backseat"—did the officers learn that Mr. Garcia had an outstanding Baytown municipal capias for public intoxication. He was booked on that pre-existing warrant. Brown's report charges him with no new offense: not resisting arrest, not assault on a public servant, not public intoxication.

**D. Mr. Garcia leaves the jail in an ambulance.**

27. After he was booked, Mr. Garcia asked to go to the hospital. Baytown EMS transported him from the Baytown jail to Houston Methodist Baytown Hospital, formerly San Jacinto Methodist Hospital. While Mr. Garcia was being treated, Brown pressed the treating physician to hurry so that Mr. Garcia could be returned to jail.

28. Brown's own report concedes that Mr. Garcia had "a scratch and redness on his right cheekbone." His injuries were worse than that. The impact with the concrete broke Mr. Garcia's nose where it meets the eye socket and caused a concussion, and he later suffered a seizure. Brown's knee and body weight drove the hardware in Mr. Garcia's body into the concrete and left bruising on both of his hips. Mr. Garcia still suffers pain, anxiety, and humiliation from the assault.

## E. Brown writes a justification, and the Department fails to act.

29. Brown wrote the Department's offense report for the encounter, General Offense No. 2025-51333. In it Brown claimed that Mr. Garcia "eased his tension briefly, hissed and through [sic] his arms and body forward, away from me as if he was either going to flee or push against the vehicle," and that Brown "immediately reacted by bear hugging him and taking him to the ground."

30. That account is false. Mr. Garcia did not hiss, did not throw his arms or body forward, and was not trying to flee or to push off the vehicle. He was handcuffed and compliant. Brown's "as if" is not an observation of resistance; it is a justification written after the fact.

31. Brown also wrote that he "utilized control techniques throughout his resistance and no other means of force." Hoisting a handcuffed man and driving him face-first into concrete is not a control technique. Kneeling on the back of a handcuffed man who is telling you he is disabled is not either.

32. When the Department printed Brown's report on December 2, 2025—51 days after the incident—its pages were still marked "NOT APPROVED." The related arrest record lists Brown himself as the officer who approved it. On information and belief, no supervisor reviewed Brown's use of force against Mr. Garcia, the Department opened no use-of-force or internal-affairs investigation, and Brown was not disciplined, retrained, or restricted.

### F. The City knew who Brown was before it made him a sergeant.

33. Brown joined the Department at the end of 2010. In 2019, a Houston activist held a press conference outside the Baytown Police Department, called on the Harris County District Attorney to investigate how the Department handles brutality complaints, and specifically accused Brown of repeatedly targeting Black men and women. A Baytown resident publicly stated that Brown had harassed him for years, including during an arrest earlier that year. The Department immediately denied the accusations and said Brown had no sustained excessive-force complaints.

34. On June 2, 2020, Brown took part in a traffic stop outside a Baytown convenience store. After the driver had been handcuffed, Brown turned on a bystander, 24-year-old Skylar Gilmore, who had been watching the stop and commenting on it. Brown told Mr. Gilmore he was under arrest for cursing in public, ordered him to put his hands behind his back, and pushed him to the ground when he did not immediately comply. According to the Harris County District Attorney's Office, Brown struck Mr. Gilmore with his knee in the shoulder and face. A bystander's video of the arrest spread widely on social media and led to a protest outside the Department.

35. The Department's Internal Affairs Division reviewed the June 2 incident. On July 20, 2020, Chief of Police Keith Dougherty fired Brown. In a July 23, 2020 press release, the Department announced that "Chief

Dougherty concluded that the actions of Officer Brown did not align with the professional standards and values, to which we hold all of our officers," and that "Officer Brown, who was a 9 year veteran of the department, was relieved of his employment with the Baytown Police Department."

36. In September 2020, a Harris County grand jury indicted Brown for assault causing bodily injury, a Class A misdemeanor, for his conduct toward Mr. Gilmore. Brown's February 2022 trial ended without a verdict. In April 2022, the District Attorney's Office dismissed the charge after Brown completed a de-escalation course.

37. Brown appealed his indefinite suspension through the civil-service process, prevailed, and was returned to the Department. On information and belief, the City returned Brown to patrol duty without any restriction on his duties, any monitoring of his use of force, or any additional use-of-force training beyond the de-escalation course required by the District Attorney's Office.

38. Brown's criminal defense attorney publicly stated that the prosecution had disclosed that both the Department's investigating detective and its internal investigator concluded that Brown used no unnecessary force on Mr. Gilmore. On information and belief, that is accurate. If it is, the Department's own investigators reviewed an officer forcing a non-threatening

bystander to the ground and kneeing him in the face, and found nothing wrong with it.

39. On May 1, 2024, the City's Civil Service Commission certified the Department's promotional eligibility list for police sergeant. Brown was ranked first, with a score of 90.03.

40. The City has adopted the fire fighter and police officer civil-service system of Chapter 143 of the Texas Local Government Code. Under that statute, the Chief of Police must promote the highest-ranked candidate on the eligibility list "[u]nless the department head has a valid reason for not appointing the person," in which case the Chief must explain the reason to the bypassed candidate and file it in writing with the Civil Service Commission. Tex. Loc. Gov't Code § 143.036(f).

41. When Brown reached the top of the list, the City's Chief of Police was John Stringer, who had succeeded Chief Dougherty in 2021. The Department's own 2020 finding that Brown's use of force violated its standards, the viral video, and the assault indictment were all in the Department's files. On information and belief, Chief Stringer did not invoke the valid-reason bypass, did not file any written reason for passing over Brown, and instead promoted Brown to sergeant on or about June 17, 2024.

42. The City made no formal announcement of the promotion. The Department did not inform the Baytown Police Advisory Committee—a body

created in 2020 to rebuild community trust after Brown and another officer were criminally charged. A Department spokesperson told the *Baytown Sun* that the Department had no choice but to promote Brown. That was not true. Section 143.036(f) gave the Chief exactly that choice.

43. As a sergeant, Brown is a first-line supervisor responsible, on information and belief, for directing patrol officers in the field and for reviewing their conduct, including their uses of force. On October 12, 2025, Brown was the senior officer on scene at the Palms Motel and directed the officers who responded to his call.

## G. The City has tolerated other force by its officers against people who posed no threat.

44. Brown's case is not the only one. On July 6, 2019, Baytown officers Teddy Sims and Samuel Serrett confronted Kedric Crawford in a grocery-store parking lot. Mr. Crawford alleged that the officers threw him to the ground, punched him, and repeatedly shocked him with a stun gun. Mr. Crawford was arrested and charged with assaulting a peace officer; that charge was dismissed in October 2019. *See Crawford v. Sims*, No. 4:20-cv-03003 (S.D. Tex.). In July 2021, Sims and Serrett were charged with aggravated assault by a public servant for the encounter. The City kept both officers on its rolls, on administrative leave, until March 8, 2024, when they surrendered their peace-officer licenses as part of a pretrial-diversion

agreement with the District Attorney's Office—an agreement the City publicly stated it had no part in.

45. Plaintiff does not plead the Crawford incident as a freestanding pattern. He pleads it because it shows what the City knew before October 12, 2025: that its officers were using serious force on people who posed no threat, and that its own disciplinary process was not what ended those officers' careers—when anything did.

## V. CLAIMS FOR RELIEF

### COUNT ONE
### 42 U.S.C. § 1983 — Fourth Amendment — Excessive Force
### Against Defendant Brown

46. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

47. The Fourth Amendment, applied to the States through the Fourteenth Amendment, protects the right to be free from excessive force in the course of a seizure. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To state an excessive-force claim, a plaintiff must allege (1) an injury (2) that resulted directly and only from a use of force that was clearly excessive to the need and (3) that the excessiveness was objectively unreasonable. *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). Reasonableness turns on "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

48. **Injury.** Mr. Garcia suffered a broken nose at the eye socket, a concussion, a later seizure, bruising to both hips, and the cheekbone abrasion that Brown himself documented. These injuries required emergency transport to a hospital. They resulted directly and only from Brown's takedown and the body-weight restraint that followed.

49. **Severity of the offense.** At most, Brown suspected Mr. Garcia of public intoxication—a Class C misdemeanor punishable only by a fine, Tex. Penal Code §§ 12.23, 49.02(c)—and the facts Brown recorded do not support even that. Mr. Garcia was standing outside his own motel room.

50. **Threat.** Mr. Garcia posed no immediate threat to Brown or anyone else. He was unarmed, as Brown recorded. His hands were cuffed behind his back. He had his hands on the SUV before he was cuffed and was asking what he had done wrong.

51. **Resistance and flight.** Mr. Garcia was not resisting and was not trying to flee. He was handcuffed and held from behind when Brown took him down, and he was handcuffed and face-down when Brown knelt on him.

52. No legitimate need for force existed once Mr. Garcia was handcuffed and compliant, and the force Brown chose was severe: a takedown, face-first, onto concrete, of a man who could not break his fall,

followed by nearly a minute of full-body-weight pressure on the back of a prone, handcuffed man whom Brown had been told was disabled and had metal pins in his body. That force was clearly excessive to any need and objectively unreasonable.

53. Brown is not entitled to qualified immunity. Long before October 12, 2025, the law of this Circuit gave every reasonable officer fair warning that slamming a handcuffed, non-resisting arrestee into a hard surface and kneeing the back of a subdued, prone arrestee violate the Fourth Amendment. *See Bush*, 513 F.3d at 501–02 (officer "forcefully slammed [the arrestee's] face into a vehicle" when she "was handcuffed and subdued"); *Ramirez v. Martinez*, 716 F.3d 369, 378–79 (5th Cir. 2013) ("use of certain force after an arrestee has been restrained and handcuffed is excessive"); *Cooper v. Brown*, 844 F.3d 517, 523–25 (5th Cir. 2016) ("once an arrestee stops resisting, the degree of force . . . is reduced"); *Darden v. City of Fort Worth*, 880 F.3d 722, 731–33 (5th Cir. 2018) (clearly established that an officer violates the Fourth Amendment by "violently slamming or striking a suspect who is not actively resisting"); *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 341–42 (5th Cir. 2020) (officers may not "physically strike a suspect who is not resisting"); *Timpa v. Dillard*, 20 F.4th 1020, 1034–38 (5th Cir. 2021) (clearly established that "continuing to kneel on the back of an individual who has been subdued" is excessive).

54. The same is true of force used on a person suspected of a minor offense who poses no threat. *See Newman v. Guedry*, 703 F.3d 757, 763–64 (5th Cir. 2012) (force against a man who "committed no crime, posed no threat . . . [and] did not resist" was objectively unreasonable in light of clearly established law); *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (abrupt takedown of a non-threatening suspect stopped for a minor offense who offered, "at most, passive resistance").

55. Brown will rely on his report and on cases such as *Poole v. City of Shreveport*, 691 F.3d 624, 628–29 (5th Cir. 2012), which upheld force used to overcome an arrestee's active physical resistance to being handcuffed. Mr. Garcia offered no resistance, and he was already handcuffed when Brown slammed him to the ground. At this stage the Court accepts the facts pleaded here, not Brown's after-the-fact account. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On the facts pleaded, no reasonable officer could have believed that Brown's force was lawful.

56. Brown acted intentionally, maliciously, and with reckless and callous indifference to Mr. Garcia's federally protected rights, entitling Mr. Garcia to punitive damages. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

57. As a direct and proximate result, Mr. Garcia suffered the injuries and damages described in this Complaint.

**COUNT TWO**
**42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Seizure**
**Against Defendant Brown**

58. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

59. Brown seized Mr. Garcia when he grabbed him by the arm and shirt, forced him away from his room, pinned him against a vehicle, and handcuffed him. *See Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). Forcibly moving a person across a parking lot, pinning him to a vehicle, and handcuffing him is an arrest that requires probable cause.

60. Brown had neither probable cause nor reasonable suspicion that Mr. Garcia had committed, was committing, or was about to commit any offense. The only offense Brown suggested—public intoxication—requires danger to oneself or others, Tex. Penal Code § 49.02(a), and Brown observed no fact suggesting danger. Mr. Garcia was speaking calmly, standing outside his own motel room, and bothering no one. Declining to give Brown his name was not an offense. Tex. Penal Code § 38.02(a). Nor was being present at a motel that Brown regarded as a high-crime location. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

61. The warrant that officers discovered after Mr. Garcia was in a patrol car cannot justify the seizure. Probable cause depends on "the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). When Brown seized Mr. Garcia, he did not know who Mr. Garcia was, and he did not know of any warrant.

62. Any reasonable officer in Brown's position would have known in October 2025 that seizing and handcuffing a man without probable cause of any offense violates the Fourth Amendment, and that Texas public intoxication requires danger to oneself or others.

63. As a direct and proximate result, Mr. Garcia suffered a loss of liberty, physical injury, humiliation, and emotional distress, and the unlawful seizure was the occasion for the force described in Count One.

## COUNT THREE
## 42 U.S.C. § 1983 — Municipal Liability
## Against Defendant City of Baytown

64. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

65. A municipality is liable under § 1983 when the execution of its official policy or custom inflicts the constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff must plead facts showing (1) an official policy or custom, (2) of which a policymaker can be charged with

actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. *See Ratliff v. Aransas County*, 948 F.3d 281, 284–85 (5th Cir. 2020). The plaintiff must do "more than describe the incident that gave rise to his injury." *Id.* at 285. A custom shown through prior incidents requires "similarity and specificity." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009). A single decision by a final policymaker may itself be municipal policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

66. **Final policymaker.** The identity of the policymaker is a question of state law that need not be pleaded. *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). Plaintiff nonetheless identifies it. Under Chapter 143 of the Local Government Code, which the City has adopted, the Chief of Police as department head holds the authority to suspend officers indefinitely, Tex. Loc. Gov't Code § 143.052(b), and to make or decline promotional appointments, *id.* § 143.036(f). On information and belief, the City has delegated to the Chief of Police final policymaking authority over the Department's discipline, promotion, supervision, and use-of-force review. The Chief of Police was Keith Dougherty in 2020 and John Stringer when Brown was promoted in 2024.

67. **Decision of a final policymaker to promote Brown.** When a policymaker's personnel decision is made with knowledge of the officer's

background, the municipality is liable if the plainly obvious consequence of that decision is the deprivation of a third party's federally protected right. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997). The Chief of Police did not need to scrutinize Brown's background to know it: the Department itself had found in 2020 that Brown's force on a non-threatening person violated its standards and had fired him for it, and a grand jury had indicted him for the same conduct. With that knowledge, and with statutory authority to pass over Brown for a valid reason, the Chief instead elevated Brown to sergeant, a supervisory position with authority over other officers and their uses of force. The plainly obvious consequence of putting Brown back on the street, unrestricted and with greater authority, was that he would again use excessive force on a non-threatening person. That is what happened to Mr. Garcia.

68. **Custom of retaining, reinstating, and promoting officers despite known force misconduct.** In the alternative, the City maintained a persistent and widespread custom, known to and tolerated by its Chiefs of Police, of failing to meaningfully discipline officers for force used on people who posed no threat. That custom is shown by specific facts:

(a) the Department's 2019 public denial of brutality complaints against Brown and its statement that he had no sustained excessive-force complaints;

(b) the Department's investigating detective's and internal investigator's reported conclusion that Brown used no unnecessary force on Mr. Gilmore in June 2020;

(c) Brown's return to patrol duty after the June 2020 incident without, on information and belief, any restriction, monitoring, or additional force training;

(d) the City's promotion of Brown to sergeant in June 2024 without invoking the statutory valid-reason bypass, without public announcement, and without informing its own Police Advisory Committee;

(e) the City's retention of officers Sims and Serrett on administrative leave for more than four years after the July 2019 Crawford incident, until they surrendered their licenses under an agreement in which the City played no part; and

(f) the Department's failure to approve, review, or act on Brown's October 12, 2025 report for at least 51 days, while the arrest record listed Brown as his own approving officer.

69. These facts show the City's policymakers knew of the risk that officers—Brown in particular—would use unjustified force on non-threatening people, and that they chose to tolerate it. That custom told Brown that force of the kind he used on Mr. Gilmore would not cost him his

career; it did not. It was the moving force behind Brown's use of the same kind of force on Mr. Garcia.

70. **Failure to supervise and review.** In the further alternative, the City was deliberately indifferent in failing to supervise Brown and to review his uses of force. Given Brown's known history, the need for close supervision of his use of force was "so obvious" that the City's failure to provide it amounts to deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Deliberate indifference is "a stringent standard of fault," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and these facts meet it: the City promoted an officer it had fired for unjustified force into a supervisory role, and then left his report of a face-first takedown of a handcuffed man unapproved and unreviewed for nearly two months. On information and belief, the City has never investigated or disciplined Brown for his force against Mr. Garcia.

71. As a direct and proximate result of the City's policy, custom, and deliberate indifference, Mr. Garcia suffered the injuries and damages described in this Complaint.

## VI. DAMAGES

72. As a direct and proximate result of Defendants' conduct, Mr. Garcia has suffered and seeks recovery for the following damages: past and

future physical pain and suffering; past and future mental anguish, emotional distress, and humiliation; physical impairment; past and future medical expenses; and loss of liberty.

73. Mr. Garcia seeks punitive damages against Brown in his individual capacity because Brown acted with malice and with reckless and callous indifference to Mr. Garcia's federally protected rights.

74. Mr. Garcia seeks his reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 1988.

## VII. JURY DEMAND

75. Plaintiff demands a trial by jury on all claims and issues so triable, under Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

## VIII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Eric Garcia respectfully requests that Defendants be cited to appear and answer, and that upon final trial the Court enter judgment in his favor and against Defendants as follows:

A. compensatory damages against Defendants Brown and the City of Baytown, jointly and severally, in an amount to be determined by the jury;

B. punitive damages against Defendant Brown in his individual capacity;

C. reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 1988;

D. pre-judgment and post-judgment interest at the highest rate allowed by law; and

E. such other and further relief, at law or in equity, to which Plaintiff may show himself justly entitled.

Dated: October 16, 2026.

Respectfully submitted,

**GRABLE PLLC**

*/s/ Brandon J. Grable*
**Brandon J. Grable**
Local Counsel
Texas Bar No. 24086983
S.D. Tex. No. 3246103
12451 Starcrest Drive, Suite 206
San Antonio, Texas 78216
Telephone: (210) 963-5297
Facsimile: (726) 215-4765
brandon@grable.law

- and -

**RADNER LAW GROUP, PLLC**

**Solomon M. Radner**
Attorney in Charge
Michigan Bar No. P73653
S.D. Tex. No. [to be supplied / pro hac vice]
17515 West 9 Mile Road, Suite 1050
Southfield, Michigan 48075
Telephone: (877) 723-6375
Facsimile: (866) 571-1020
solomon@radnerlawgroup.com

**COUNSEL FOR PLAINTIFF**